IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COREY WILLIAMS,<br><br>      Plaintiff,<br><br>  vs.<br><br>PAM AHLIN, et al,<br><br>      Defendants. | Case No. 1:10-cv-00984 JLT (PC)<br><br>ORDER DISMISSING THE FIRST AMENDED COMPLAINT WITH PREJUDICE<br><br>(Doc. 15) |

Plaintiff is a civil detainee housed at Coalinga State Hospital pursuant to the Sexually Violent Predators Act. (Doc. 1 at 1) He is proceeding in forma pauperis according to the Court's order dated June 16, 2010. (Doc. 8) On August 31, 2011, the Court screened Plaintiff's complaint and found that it did not state a claim. (Doc. 10) The Court granted Plaintiff leave to file an amended complaint to cure the deficiencies identified in the order. Id. After granting Plaintiff an extension of time to file the amended complaint, on October 14, 2011, Plaintiff filed his First Amended Complaint. (Doc. 15)

After once again screening the First Amended Complaint, the Court finds that despite the explicit recitation of the deficiencies of Plaintiff's original complaint, the First Amended Complaint fails to demonstrate any violation of federal law or Constitution. Thus, the Court will **DISMISS** the action **WITH PREJUDICE**.

**I.     SCREENING REQUIREMENT**

Under 28 U.S.C. § 1915(e)(2)(B), the Court must dismiss a case in which the plaintiff proceeds

1

in forma pauperis if the court determines that the case "fails to state a claim on which relief may be granted" or is "frivolous."

To state a claim on which relief may be granted, plaintiff must set forth "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A district court must liberally construe a pleading filed by a self-represented litigant to determine if it states a claim and, before dismissal, outline the deficiencies in the complaint and give the plaintiff an opportunity to amend unless the deficiencies cannot be cured. See Lopez v. Smith, 203 F.3d 1122, 1130-31 (9th Cir. 2000).

A claim is legally frivolous when it lacks an arguable basis either in law or in fact. Neitzke v. Williams, 490 U.S. 319, 325 (1989); Franklin v. Murphy, 745 F.2d 1221, 1227-28 (9th Cir. 1984). Accordingly, the court may dismiss a claim as frivolous where it is based on an indisputably meritless legal theory. Neitzke, 490 U.S. at 327.

In order to sustain a cause of action under 42 U.S.C. § 1983[1], a plaintiff must show (i) that he suffered a violation of rights protected by the Constitution or created by federal statute, and (ii) that the violation was proximately caused by a person acting under color of state law. See Crumpton v. Gates, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant affirmatively acted, participated in another's affirmative act, or failed to perform an act which he was legally required to do that caused the deprivation at issue. Arnold v. IBM, 637 F.2d 1350, 1355 (9th Cir. 1981) (quoting Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir. 1978)).

To plead a claim under § 1983, Plaintiff must comply with Federal Rule of Civil Procedure 8(a)(2), which requires only "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Nevertheless, Plaintiff's obligation to provide the grounds of entitlement to relief under Rule 8(a)(2) requires more than "naked assertions," "labels and conclusions," or "formulaic recitation[s] of the elements of a cause of action." Twombly, 550 U.S. at 555-57. The

---

[1] As in his original complaint, the First Amended Complaint does not specify under what federal statute he intends to sue. However, because he seeks to vindicate his right to due process and equal protection, it appears he intends to proceed under 42 USC § 1983.

complaint "must contain sufficient *factual matter*, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868, 883 (2009) (quoting Twombly, 550 U.S. at 570) (emphasis added).

## II.   THE COMPLAINT

Plaintiff alleges that in May 2009, he began making marriage plans with his fiancee, who was not in state custody. (Doc. 15 at 5) At that time, he learned from another detainee that he was required to adhere to Administrative Directive 618 ("AD 618"). (Doc. 15 at 24-26) AD 618 was part of the Operating Manual at Coalinga State Hospital ("CSH")[2]. Id. at 24.

---

[2] Though Plaintiff supplies the current version of AD618, it was not in effect at the time of the events giving rise to the complaint. (Doc. 15 at 24) Thus, the Court takes Judicial Notice of the Administrative Policy 618, taken from the Coalinga State Hospital Operating Manual, effective April 12, 2007. Fed. R. Evid. 201 (court may take judicial notice of adjudicative facts in absence of request of party at any stage of the proceeding); Greeson v. Imperial Irr. Dist., 59 F.2d 529, 531 (9th Cir. 1932) (court may take judicial notice of public facts and public documents). Here there is no dispute as to the content of AD 618, given Plaintiff has plead operative facts contained in it.
AD 618 provides,
   I. PURPOSE
   To assist Individuals who choose to exercise their rights to marry while living at Coalinga State Hospital (CSH).
   II. AUTHORITY
   California laws relating to marriage are contained in Division IV, of the Civil Code, Section 4100 et. seq.
   III. POLICY
   Treatment of Individuals is a primary mission of CSH. Treatment of an Individual may include planning for future living arrangements and may involve marriage planning. Hospitalization does not, by itself, constitute a barrier to marriage. An Individual has the legal right to marry while hospitalized, with the exception of court conservatees. Hospital staff has the ethical obligation to provide guidance and counseling.
   IV. METHOD
   A. To initiate a request for marriage planning, the Individual must supply in writing to his Wellness and Recovery Team via his social worker:
   1. The names, addresses, ages, and present marital status of both marriage partners.
   2. Release of Information signed for the fiancee.
   B. The social worker will immediately forward to the appropriate hospital chaplain a stamped MH 5722, Consultation Referral and Report. It will be the Individual's responsibility to follow up with the chaplain for consultation.
   C. The appropriate chaplain and the staff social worker assigned to the unit will interview the Individual and his fiancee individually and jointly. (Under guidelines of WIC 5328 and the Tarasoff Decision.)
   D. On receipt of the Chaplain's Consultation and Report (MH 1731), the Unit Supervisor or designee shall schedule the Individual for an immediate Wellness and Recovery Team meeting. to which the chaplain and social worker will be involved.
   E. The Wellness and Recovery Team shall interview the Individual and document on MH 5728 discussion of the following areas:
   1. Individual's current status and progress in treatment.
   2. The relationship between the Individual's progress and his marriage plan.
   3. An evaluation of the fiancee's understanding of the Individual's history, offense, and emotional and behavioral problems. If she has not been interviewed, a statement as to why not.
   4. A summary of both the pros and cons of the marriage plan.

3

1  Plaintiff reviewed AD 618 and disagreed with the policy because he believed that there should be no

2  restrictions placed upon his right to marry and because he believed that the policy did not advance any

3  safety or security goals. Id. at 5.

4      Plaintiff alleges that to be able to marry, according to AD 618, he had to obtain the approval of

---

F. The treating psychologist shall note the wellness and recovery team's opinion regarding the Individual's marriage request, and a copy of the note will be forwarded to the Program Director.
G. If the prospective spouse is under the age of 18, the Individual shall obtain written consent of parent(s) or guardian and the court as described in Civil Code Section 4100.
H. The Individual's request, with the team documentation and the chaplain's written reply attached, shall be countersigned by the Program Director as having been reviewed. Both documents will then be routed to the Medical Director for final review.
I. The Individual shall be given a copy of the final team evaluation. The Individual may not be denied the marriage unless by court order or discovery of existing marriage.
J. If the Individual then wishes to proceed with his plan, he must make the arrangements described in Section V.
V. PLANS
A. All planning for the wedding is the responsibility of the couple, their families, and the officiant.
B. The marriage partner must go to the County Clerk's office in Fresno to initiate the marriage license and fill out all necessary papers in advance of the ceremony.
C. At least two weeks prior to the date of the wedding, the Individual must provide the following:
1. The Trust Office with an estimated cost of those items to be paid from the Individual's account, names and addresses of vendors, and sufficient funds to cover such costs.
2. To Department of Police Services (DPS) and Program Director:
a. Date, time, and duration of ceremony, to be determined in consultation with Hospital Police Services according to visiting room schedule.
b. Name of person who will perform the ceremony.
c. Names and addresses of any service providers who will have a need to enter the visiting room.
d. Guest list must not exceed more than 6 visitors, including other Individuals, as approved by their treatment teams.
D. If the Individual desires the services of an outside clergy person to officiate at his wedding, the outside clergy person must first be approved by the Department of Pastoral Services and Police Services. Individuals who are ministers may not perform marriages for other Individuals or staff.
VI. COSTS
All expenses of the wedding are the responsibility of the couple. All financial transactions paid by the Individual shall be handled through the Trust Office as for any other expenditure. Basic costs will include:
A. Cost of the license may be paid by the Individual through the Trust Office, or by the partner or family member.
B. Costs of flowers, decorations, refreshments, photographs, special clothing, etc., and fee, if any, to person solemnizing marriage if not a hospital chaplain, shall be paid either by the Individual through the Trust Office, by the partner or family member.
VII. WEDDING CEREMONY
A. Religious marriages of Individuals may be solemnized in the visiting room, as authorized by the Department of Pastoral Services.
B. Marriage ceremonies shall not be combined with any other social or therapeutic activity.
C. Use of the visiting room shall be scheduled through Hospital Police Services, and shall not conflict with any regularly scheduled visiting room activity.
D. Gifts shall not be brought inside the security area of the hospital, and must be removed from the hospital grounds by the bride, family, or friends when they leave.
E. Normal security procedures, including search, will be in effect for both Individuals and visitors.

4

his Wellness and Recovery Team ("WRT") and others at CSH. (Doc. 15 at 5) Most notably, Plaintiff objected to having to sign a release that would allow CHS officials to talk with his fiancee about his condition. Id. He alleges that unless his fiancee spoke with the CHS officials, they would not be permitted to marry. Id. Other detainees told Plaintiff that the reason for the meeting with the fiancee was to discourage her from marrying Plaintiff based upon his criminal history. Id.

However, Plaintiff attaches a letter sent to him by the California Department of Mental Health. (Doc. 15 at 13) The letter responds to Plaintiff's expressed concern that CHS officials not contact his fiancee. Id. The DMH assured Plaintiff that no such meeting was required and that his fiancee may refuse to meet without any adverse result on the right to marry. Id. The content of the letter accurately described AD 618 which indicates that if the fiancee is not interviewed, the WRT must explain why. Moreover, the policy makes clear that the detainee may not be denied the marriage unless by court order or discovery of existing marriage.[3]

Plaintiff objected also that the marriage couple would be required to pay the overtime costs for security personnel to oversee the ceremony that could occur only after visiting hours. (Doc. 15 at 5) Plaintiff objected to this because he believed that other events had been hosted at CSH with hundreds of detainees present which did not result in a detainee having to pay for security costs. Id. Finally, Plaintiff alleges that due to the requirements of AD 618, his relationship with his fiancee deteriorated and she cut off all contact with him. (Doc. 15 at 5-6) Plaintiff seeks declaratory relief for himself and other similarly situated. Id. at 7.

AD 618 identifies as its purpose, "To assist Individuals who choose to exercise their rights to marry while living at Coalinga State Hospital (CSH)." The policy reports that "Hospitalization does not, by itself, constitute a barrier to marriage. An Individual has the legal right to marry while hospitalized . . ." Id. However, AD 618 imposes upon the detainee the obligation to request marriage planning and, in doing so, to provide information about the eligibility of the detainee and the fiancee to marry. Id. Likewise, the detainee is required to sign a release that allows CSH to speak to the fiancee about her

---

[3]Plaintiff relies upon a letter from the California Office of Patients' Rights which indicates that agency's belief that AD 618 "is problematic as written as it implies that [the] Wellness and Recovery Team has the authority to deny individuals the right to marry." (Doc. 15 at 17) However, this interpretation is contrary to the explicit language of AD 618 which states, "The Individual may not be denied the marriage unless by court order or discovery of existing marriage."

5

"understanding of the Individual's history, offense, and emotional and behavioral problems."

Under AD 618, the detainee is required to participate in an interview with the hospital chaplain and his assigned social worker. Afterward, the detainee's Wellness and Recovery Team ("WRT") must meet to discuss the information gained from interviews and the evaluations prepared by the chaplain and social worker. After the meeting, the detainee's marriage request, the WRT's opinion and the chaplain's report are provided to CSH's Program Director for review. Next, the Medical Director provides the final review but he cannot deny the marriage request. Instead, the marriage the Medical Director must permit the marriage except "by court order or discovery of existing marriage."

According to AD 618, assuming no court order and neither the detainee nor the fiancee are married already, they may proceed with the marriage. The couple is responsible for making the wedding plans, with the assistance of their family if they wish, and the officiant. The fiancee is required to obtain the marriage license from the Fresno County Clerk.

AD 618 requires the detainee, the fiancee or their families to bear the cost of the ceremony. In advance of the ceremony, the detainee must provide an estimated cost of the items that will be paid from his trust account and the names and addresses of those to be paid. Likewise, the detainee must identify the date and time of the ceremony and provide an estimate of the event's duration. The detainee must provide the name of the officiant and any other service providers and guests who will attend the ceremony. The detainee is permitted to select an outside clergy person of his choice or may use the services of a hospital clergy person. The only prohibition is that if a detainee is a minister, the minister-detainee may not officiate at the ceremony of another detainee. Finally, if a religious marriage ceremony is selected, it "may be solemnized in the visiting room, as authorized by the Department of Pastoral Services."

Plaintiff alleges that he learned from another detainee that there are other, unwritten policies imposed by Defendant Ahlin related to marriages. In particular, Plaintiff alleges that the clergy employed by the facility are not permitted to conduct the marriage ceremony and that the detainee is required to pay for the overtime costs of officers who provide security during the ceremony because the ceremonies are not permitted to occur during normal visiting hours. (Doc. 15 at 5, 9-11)

As a result of his complaints about Ad 618, the Defendants agreed that Plaintiff would not be

required to comply with AD 618 or the unwritten policies. (Doc. 15 at 16) Additionally, CSH and Plaintiff worked together and came to a resolution "that was agreeable to [Plaintiff]." (Doc. 15 at 16, 18, 19) Nevertheless, in this lawsuit, Plaintiff seeks to enjoin enforcement of AD618 and the unwritten marriage policies and seeks a declaration of rights for himself and all others similarly situated. (Doc. 15 at 7)

### III. DISCUSSION

#### A. Plaintiff may not assert the rights of others

Although Plaintiff may appear and represent himself (28 U.S.C. § 1654), as he is doing here, this privilege is personal to him. No pro se plaintiff has the authority to appear as an attorney for others or to prosecute a complaint or seek damages on behalf of others. Russell v. United States, 308 F.2d 78, 79 (9th Cir. 1962)("A litigant appearing in propria persona has no authority to represent anyone other than himself"); McShane v. United States, 366 F.2d 286, 288 (9th Cir. 1966) (lay person lacks authority to appear as an attorney for others). Therefore, as to the grievances recited by Plaintiff that others possess and as to his request for relief for other detainees, the First Amended Complaint is **DISMISSED**.

#### B. Background of the SVP Act

Plaintiff is being held under the Sexually Violent Predator ("SVP") Act at CSH. (Doc. 1 at 1-2) To be determined to be an SVP, the detainee must have been convicted of a sexually violent offense and have a diagnosed mental disorder that makes it "likely that he . . . will engage in sexually violent criminal behavior." Cal. Welf. & Instit. Code § 6606(a)(1). Sexually violent offenses include such acts as rape, spousal rape, aggravated sexual assault of a child, sodomy, lewd or lascivious acts involving children, oral copulation, continuous sexual abuse of a child and penetration by a foreign object or kidnaping or assault with the intent to commit one of these other crimes. Cal. Welf. & Instit. Code 6000(b). The sexually violent act must have been committed "by force, violence, duress, menace, fear of immediate and unlawful bodily injury on the victim or another person, or threatening to retaliate in the future against the victim or any other person . . ." Id. SVPs may be held for an indeterminate term but the continued need for detention must be reviewed annually. Cal. Welf. & Inst. Code §§ 6604, 6605.

Though SVPs are not prisoners, the danger they pose to others cannot be ignored. "Sexually violent predators are involuntarily committed because their mental disease makes them dangerous to

others. [Footnote] Neither the commitment nor the evaluation proceeding is something they themselves seek in order to obtain a cure. The state evaluates and commits to protect others from them." Seaton v. Mayberg, 610 F.3d 530, 540 (9th Cir. 2010), footnote omitted. Likewise, in Garcetti v. Superior Court, 85 Cal.App.4th 1113, 1117 (Cal. App. 2d, 2000), the court held that the Sexual Violent Predator Act "is aimed at protecting society from, and providing treatment for, that 'small but extremely dangerous group of sexually violent predators' who have diagnosable mental disorders identified while they are incarcerated for designated violent sex crimes, and who are determined to be unsafe and, if released, to represent a danger to others through acts of sexual violence."

Plaintiff's status under the SVPA makes him a civil detainee. "Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish. Youngberg v. Romeo, 457 U.S. 307, 322 (1982)). As such, Plaintiff is entitled, at a minimum, to those rights provided to inmates confined in penal institution. McNeal v. Mayberg, 2008 U.S. Dist. LEXIS 101926 at *3 (E.D. Cal. Dec. 3, 2008). Thus, the Court is on sound footing in relying upon cases involving incarcerated persons as a constitutional minimum to which Plaintiff is entitled.

**C.    Due Process right to marry**

Detainees have a constitutional right to marry. Turner v. Safley, 482 U.S. 78, 95-96 (1987); see also Zablocki v. Redhail, 434 U.S. 374, 385-86 (1978) (marriage is a fundamental right and liberty protected by the due process clause of the Fourteenth Amendment); Loving v. Virginia, 388 U.S. 1, 12, (1967) (right to marry is of fundamental importance for all individuals). Though some curtailment of the right to marry may be expected by the fact of confinement in a state hospital (See Overton v. Bazzetta, 539 U.S. 126, 131 (2003)), a facility regulation must not interfere with a constitutional right unless it is reasonably related to legitimate penological interests. Turner, 482 U.S. at 89.

In adopting this standard of review, the Court held that deference to the decisions of the facility officials is required. "Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decision making process, for every administrative judgment would be subject to the possibility that some

court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration." Turner, 482 U.S. at 89, quoting Procunier v. Martinez, 416 U.S. 396, 407 (1974). Therefore, though a complete ban on the decision to marry may not be reasonably related to any valid penological interest, prison officials may regulate the time and circumstances under which the marriage ceremony itself takes place. Turner. 482 U.S. at 99.

A number of factors are relevant in determining whether a challenged regulation is reasonable. Turner at 89-91. First, the Court must evaluate whether there is a legitimate and neutral objective to the regulation. Id. Second, the Court must consider whether there are alternative means to exercise the right. Id. Third, the Court should determine the impact on others, including the allocation of the facility's resources, if exercising the right is accommodated. Id. In this regard, the Court is required to defer to the informed judgment of prison officials, Turner, at 91. Finally, the Court must be mindful that the absence of ready alternatives to the facility's regulation is evidence of its reasonableness. Id. As to this final factor, prison officials need not prove that "that no reasonable method exists by which [prisoners'] . . . rights can be accommodated without creating bona fide security problems." O'Lone v. Estate of Shabazz, 482 U.S. 342, 347-348 (1987) (citation omitted) Instead, "the availability of accommodations is relevant to the reasonableness inquiry" but courts must accord "respect and deference . . . for the judgment of prison administrators" when considering whether reasonable alternatives to a challenged regulation are available. Id. Consistent with this, "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Turner, at 89. Instead, it is the obligation of the inmate to identify an obvious, easy alternative that fully accommodates the inmate's rights at de minimis cost to penological interests. Id.; O'Lone, at 353.

### *Analysis*

Plaintiff raises several complaints related to AD 618 and the informal customs of CSH. First, Plaintiff complains that AD 618 requires him to obtain permission to marry from his WRT. (Doc. 15 at 5) Second, he complains that the policy requires his fiancee to be interviewed by his WRT and that he is required to sign a release to allow his case file to be discussed with her. Id. Third, Plaintiff

complains that he and his fiancee are required to pay for the overtime costs of staff providing security during the marriage ceremony. Id.

As the Court found previously, after considering the Turner factors set forth above, the Court does not find that AD 618 is constitutionally infirm. First, the refusal of the fiancee or the detainee to participate or cooperate with the policies set forth in AD 618 is not a basis to deny the detainee the right to marry. To the contrary, the policy indicates that, "Hospitalization does not, by itself, constitute a barrier to marriage. An Individual has the legal right to marry while hospitalized . . ." More importantly, AD 618 affirms that, "The Individual **may not be denied the marriage** unless by court order or discovery of existing marriage." (Emphasis added.)

Moreover, the permission granted the WRT to meet with the detainee and the fiancee to discuss their marriage plans, is an ethical obligation and a legal duty that has been condoned by the courts. AD 618 relies upon California Welfare & Institutions Code § 5328 and Tarasoff v. Regents of Univ. of Cal., 17 Cal. 3d 425, 431 (Cal. 1976) for its underpinnings. Section 5328 provides,

> **When the patient**, in the opinion of his or her psychotherapist, **presents a serious danger of violence to a reasonably foreseeable victim** or victims, **then any of the information or records specified in this section may be released to that person** or persons and to law enforcement agencies and county child welfare agencies **as the psychotherapist determines is needed for the protection of that person** or persons.

Cal. Welf. & Instit. Code § 5328, emphasis added. Likewise, the Tarasoff decision holds, in pertinent part,

> **When a therapist determines**, or pursuant to the standards of his profession should determine, **that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger**. **The discharge of this duty** may require the therapist to take one or more of various steps, depending upon the nature of the case. Thus it **may call for him to warn the intended victim or others likely to apprise the victim of the danger**, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances.

Tarasoff, at 431, emphasis added. Thus, it appears clear that part of the purpose of AD 618 is to ensure that the person marrying the SVP, knows the risks attendant thereto. As discussed above, SVPs who remain hospitalized, pose a significant danger to others and the suggestion that CHS officials should not attempt to ensure that the fiancee know these risks is unsupported. Seaton v. Mayberg, 610 F.3d at 540; Garcetti v. Superior Court, 85 Cal.App.4th at 1117. Likewise, the suggestion that AD 618 is a violation

10

of Plaintiff's constitutional rights because it permits discussion of the marriage plan with him and his fiancee–in light of the fact that the refusal to cooperate in the discussion is not grounds to deny the marriage–is unsound. Of great significance is the fact that, short of a court order or a preexisting marriage, CSH officials lack any authority to prohibit the marriage. Thus, AD 618 places no unconstitutional barrier to the right to marry.

Second, Turner makes clear that CSH may regulate the time and circumstances of the ceremony. Turner, 482 U.S. at 99. Thus, the fact that CSH will not permit a marriage ceremony during normal visitation hours–when other detainees are visiting with their family and friends–is within its authority. The increased risk of disruption and the threat to the internal security of the facility posed by guards having to monitor normal visitation and the wedding ceremony at the same time, are valid concerns by facility officials. Thus, requiring the ceremony to happen outside of visiting hours is exactly the type of decision that Courts are required to afford deference to the judgment of facility staff. Id. at 89.

Likewise, the fact that Plaintiff and the fiancee must bear the cost of the ceremony is a proper exercise of the CSH's authority. There is no legal precedent that CSH must use its resources to provide Plaintiff a marriage license, a clergy person or a wedding ceremony. Obtaining a marriage license, paying for the ceremony and securing and paying for a clergy person to perform the ceremony, are duties that brides and grooms regularly face when contemplating marriage. The fact that Plaintiff is civilly detained, does not shift these responsibilities to the state. Moreover, it is not AD 618 that makes planning the wedding ceremony more difficult; it is the fact of Plaintiff's hospitalization that does this. See Overton, 539 U.S. at 131.

Therefore, the Court finds that AD 618 and the unwritten policies described by Plaintiff, have legitimate and neutral objectives related to penological goals. Moreover, there are alternative means for Plaintiff to exercise his right to marry. For example, Plaintiff can plan his wedding before or after visiting hours and on a day and time when guards are not on overtime. In this same vein, requiring the wedding to occur at state expense, places an undue burden on limited state hospital resources and, in essence, would confer a benefit on marrying detainees that would not be given to others, and would encourage marriage rather than merely remaining neutral on the topic. Finally, there is an absence of ready alternatives to the limitations of AD 618 that would not place a greater than de minimis burden

of state resources.  Therefore, the Court finds that Plaintiff's complaint does not state a claim under the Due Process Clause.

### C.     Violation of Equal Protection

The Equal Protection Clause ensures that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985). To state an equal protection claim, Plaintiff must allege that: (1) he is a member of an identifiable class; (2) he was intentionally treated differently from others similarly situated; and (3) there is no rational basis for the difference in treatment. Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).

Plaintiff asserts that CSH does not allow marriage ceremonies to occur during normal visiting hours which, he alleges, means that he and his fiancee are required to pay "overtime" costs for security guards who oversee the wedding. (Doc. 15 at 5)  On the other hand, Plaintiff alleges that other functions are permitted to occur within the secure portion of the hospital that permit outside guests and detainees to attend and the costs of security are borne by CSH.  Id.

However, as in his original complaint, Plaintiff is not a member of a suspect class (Carmony v. Mayberg, 2010 U.S. Dist. LEXIS 107754 at *53 (E.D. Cal. Oct. 7, 2010)("SVP prisoners are certainly not a suspect class") quoting People v. Sumahit, 128 Cal. App. 4th 347, 354 (Cal. App. 3d Dist. 2005)), and there are no facts alleged that he has been treated any differently than any other detainee wishing to marry. (Doc. 15 at 9-11)  Thus, he has not stated a claim under the Equal Protection Clause.

### D.     Injunctive Relief

A claim is considered moot if it has lost its character as a present, live controversy, and if no effective relief can be granted. Flast v. Cohen, 392 U.S. 83, 95 (1968).  Nevertheless, as a remedy, Plaintiff seeks to enjoin the enforcement of AD 618 and the other unwritten marriage policies. However, the First Amended Complaint admits that Plaintiff has been granted permission to marry without regard to the requirements of CSH's policies.  On the other hand, Plaintiff has supplied the Court the current version of AD 618 which alleviates most of Plaintiff's expressed concerns.  (Doc. 15 at 24-26)  First, as before, the new policy emphasizes that, though CSH has an ethical obligation to discuss the impending marriage and how it impacts the detainee's recovery, the detainee has the right to marry regardless of the policy unless he is already married or a court order precludes it.  Id. at 24-24.  Second, the new

version of AD 618 deletes the requirement that the detainee sign a release to allow his case information to be discussed with his fiancee. Id. Third, the policy no longer mentions any interview of the fiancee. Id. at 25. Instead, any discussion related to the fiancee's knowledge of the detainee's violent history or treatment status is limited to the detainee. Id. Though this policy does not address the unwritten customs that Plaintiff alleges are followed, the fact that Plaintiff has been assured that none of the policies, written or unwritten, will be applied to him. Thus, he has failed to demonstrate any live controversy such to entitle him to injunctive relief.

### IV.     No Leave to Amend

The Court declines to provide Plaintiff further leave to amend. Plaintiff's claims are foreclosed as a matter of law. Moreover, despite being given leave to amend, Plaintiff failed to address any of the deficiencies identified in the Court's previous order. This makes clear that Plaintiff cannot state a claim. Notably, in the Court's earlier order, the Court warned Plaintiff that his "**failure to comply with this order will result in an order dismissing this matter.**" (Doc. 10 at 13, emphasis in the original) Thus, Court finds that there is no doubt that Plaintiff cannot cure the deficiencies in the complaint. See Lopez, 203 F.3d at 1127 ("[A] district court should grant leave to amend . . ., unless it determines that the pleading could not possibly be cured by the allegation of other facts.").

### V.     CONCLUSION

Accordingly, it is **HEREBY ORDERED** that:

1.     Plaintiff's First Amended Complaint is **DISMISSED**

2.     The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated:   **November 2, 2011**              /s/ Jennifer L. Thurston
                                                                UNITED STATES MAGISTRATE JUDGE